## Appellate Department, Superior Court, Fresno

[Civ. A. No. 68.    Sept. 8, 1959.]

SHELL CHEMICAL CORPORATION (a Corporation), Plaintiff and Appellant, v. OWL TRANSFER COMPANY (a Corporation), Defendant and Appellant.

A. J. Fabris and David D. Ring for Plaintiff and Appellant.

Rowell, Lamberson & Thomas for Defendant and Appellant.

GOLDSTEIN, J. — Both parties have appealed from a judgment of the lower court, awarding to plaintiff damages. In order to avoid confusion, we shall refer to the parties respectively as the plaintiff and the defendant.

At the times involved in the litigation, the defendant was a public warehouseman. On June 11, 1953, the plaintiff delivered to the defendant, for storage, 96 drums of fertilizer containing a chemical known as Dieldrin. Prior to storage, the plaintiff had stenciled on each of the drums words showing the concentration of Dieldrin in each drum.

Thereafter, during the month of March, 1954, the plaintiff discovered that the drums had been incorrectly stenciled by it and that the true concentration of Dieldrin therein was higher than that originally shown. Accordingly, the plaintiff gave written instructions to the defendant to restencil each of the drums so as to show their true and higher concentration of Dieldrin. The defendant admittedly received the plaintiff's written instructions. However, it never complied therewith. Had the defendant complied with the instructions, the drums would have borne evidence showing that the entire lot contained 991 pounds more of Dieldrin than was indicated thereon.

Thereafter, in August, 1954, the plaintiff sold the entire lot of merchandise to one of its customers and gave written instructions to the defendant to ship the drums to its purchaser. At the time when the sale was made and the instructions were given, the plaintiff assumed that the defendant had restenciled each of the drums in accordance with its instructions. When the purchaser received the Dieldrin, it assumed that the true concentration of Dieldrin was stenciled on the drums and, in using the Dieldrin in its manufacturing processes, evaluated its content based upon the concentration originally stenciled on the drums rather than its actual and true strength.

Discovery of the failure to restencil the drums was made for the first time when payment became due to the plaintiff from its customer. It was then too late to remedy the situation created by the failure of the defendant to restencil the drums. The customer paid the plaintiff for the Dieldrin at a price based upon the concentration shown on the drums rather

than the true concentration of Dieldrin therein. As a result, the plaintiff sustained a loss of $1,783.80 which represented the value of 991 pounds of Dieldrin at $1.80 per pound. The trial court made a finding that the sum of $1,783.80 was the actual loss sustained by the plaintiff as a result of the failure to restencil the drums.

The trial court, however, did not award to the plaintiff the full damages which it found the plaintiff had sustained. On the contrary, it limited the plaintiff's damages by the application of rule 19A(a) of the public tariff, filed by the defendant with the California Public Utilities Commission. That rule placed a maximum limit on the defendant's liability to persons who stored merchandise with it for the "loss of or damage to merchandise" while it was in the defendant's custody, of 12½ cents per pound, unless a greater value was declared at the time of storage by the storer of the merchandise. It was admitted, without dispute, that no such declaration had been made by the plaintiff. It was the view of the trial court that the damages sustained by the plaintiff represented a "loss of" merchandise and that accordingly, it was bound by the maximum limitation in rule 19A(a) of the defendant's public tariff. The court found that the damages represented by the loss of 991 pounds of Dieldrin at 12½ cents per pound amounted to the sum of $135.36. It also found, without dispute, that the defendant was entitled to a counterclaim against the plaintiff for the sum of $138.28 for the storage, handling and shipping of the Dieldrin. Accordingly, the trial court awarded judgment in favor of the defendant and against the plaintiff for the excess of the defendant's counterclaim, to wit, $2.92. Had the trial court awarded the plaintiff its full damages, less the defendant's counterclaim, the plaintiff would have been entitled to a judgment against the defendant in the sum of $1,654.52.

The evidence was not transcribed. The trial court, however, made written findings of fact and conclusions of law. Among its conclusions of law, the court found: "that defendant owed plaintiff a legal duty to change the stencils on the 96 drums of chemical fertilizer, in accordance with plaintiff's instructions to do so, and defendant breached this duty causing damage to plaintiff in the amount of $1,783.80."

Both parties have appealed from the ruling of the court. The plaintiff contends on its appeal that the trial court should have awarded the full amount of its damages (less the de-

fendant's counterclaim), and improperly applied the limitations of rule 19A(a) in measuring the plaintiff's damages. The defendant contends, *in limine,* that the plaintiff was not entitled to any damages whatsoever, its contention being that the defendant was under no legal duty to comply with the plaintiff's request to restencil the drums. The defendant contends further that, if it is liable to the plaintiff at all, then the trial court applied the proper rule of damages.

We have concluded that the plaintiff is entitled to its full damages from the defendant, less the amount of the counterclaim of the defendant, and that the judgment should be modified accordingly.

The trial court correctly determined that the defendant was under a legal duty to comply with the plaintiff's instructions. This duty arises, basically, from the provisions of defendant's own published tariff.

Rule 32-A of defendant's tariff provides: "The rate per package for *stenciling,* marking or tagging packages (ordinary shipping size) will be 1¼ cents, minimum charge 13 cents. In addition, special stencils furnished by the warehouse will be charged for." (Emphasis added.)

Rule 33-B of that tariff provides: *"Shipping includes stenciling,* marking, tagging, . . . (Emphasis added.)

The two rules above quoted, construed together, indicate clearly that the defendant represented to the public and, in particular to those who availed themselves of the defendant's services, that among the services rendered by the defendant to its customers was that of stenciling packages stored with the defendant. Defendant's counsel concedes in its brief, that the defendant, as a warehouseman, was under a legal duty to "store, care for and deliver" goods committed to its care. The word "deliver," and the word "ship," are for the purpose of this case synonymous with each other. Since the word "shipping," as used in the defendant's tariff by definition, embraces the word "stenciling," it follows that the plaintiff was fully justified in assuming that the defendant would comply, and had complied, with its instructions to stencil the drums containing the Dieldrin.

The defendant, as a public utility, was bound to render to its customers the services described in its tariff. A refusal so to do would constitute unlawful discrimination. It had no right to decide for itself, at its own whim or desire, whether it would or would not render such service. In 73 Corpus Juris Secundum, page 999, it is stated:

"A public utility is obligated by the nature of its business to furnish its service or commodity to the general public, or that part of the public which it has undertaken to serve, without arbitrary discrimination, and it must, to the extent of its capacity, serve all who apply, on equal terms and without distinction, as far as they are in the same class and similarly situated, since a reasonable classification is permissible, provided all those similarly circumstanced are treated alike.

"Accordingly, a utility must act toward all members of the public impartially, and treat all alike; and it cannot arbitrarily select the persons for whom it will perform its service or furnish its commodity, or refuse to one a favor or privilege which it has extended to another, since the term 'public utility' precludes the idea of service which is private in its nature and is not to be obtained by the public. Such duties arise from the public nature of a utility, and statutes providing affirmatively therefor are merely declaratory of the common law."

In 73 Corpus Juris Secundum, at page 995, it is stated: "The extent of the public duty of a utility is largely determined by the service it professes to render."

In *Hotchkiss* v. *Moran*, 109 Cal.App. 321, the court states at page 324 [293 P. 148]: ". . . a public utility corporation is bound, upon demand, to supply its commodity to consumers."

There is an additional ground for imposition of liability on the defendant. When the defendant received the plaintiff's written instruction to restencil, its duty became clear. In the exercise of good faith, it was then required to do something more than ignore the instructions. If the defendant never intended to comply with the instructions, its minimal duty was to so notify the plaintiff. Warned by such refusal, the plaintiff could have made other arrangements to stencil the drums. However, the plaintiff was fully justified, under the circumstances, in assuming that its instructions had been obeyed. The relationship between the parties required the defendant either to speak or act. (Williston on Contracts, §§ 91, 91a, p. 283.) Having done neither, it may not now escape liability for its failure to do that, which, in good conscience, was its plain and simple duty. ▆ The case falls squarely within the rule announced in *Wood* v. *Gunther*, 89 Cal.App.2d 718, where the court stated at page 731 [201 P.2d 874]:

". . . where the relation between the parties is such that the offeror is justified in expecting a reply, *or the offeree is under a duty to reply,* the latter's silence will be regarded as acceptance. Under such circumstances, 'one who keeps silent, knowing that his silence will be misinterpreted, should not be allowed to deny the natural interpretation of his conduct.' " See to the same effect *McAulay* v. *Jones,* 110 Cal.App.2d 302 [242 P.2d 650]; *Laredo National Bank* v. *Gordon,* 61 F.2d 906.

The next question to be considered is whether the trial court applied the correct rule of damages. In its decision, the trial court took the view that it was limited by rule 19A(a) of the defendant's published tariff in fixing the plaintiff's damages. The pertinent portion of that rule reads, "the maximum limit of the warehouseman's liability for *loss of or damage to* merchandise shall be conclusively presumed to be not in excess of" 12½ cents per pound, unless a higher declaration of value was made by the storer at the time of storage. (Emphasis added.) Rule 19A(a) required payment of a higher storage rate where the higher value was declared.

Defendant, in its brief, argues that in the instant case there was a loss of 991 pounds of Dieldrin resulting from its failure to stencil. This loss, it contends, occurred when the Dieldrin was used in the plaintiff's customer's manufacturing process, in ignorance of the fact that the lot actually contained 991 pounds more of Dieldrin than was shown on the drums. We do not, however, construe rule 19A(a) so broadly. The words "loss" and "damage" as used in that rule not only must be limited to such loss or damage as occurs while the goods are in the custody or under the control of the warehouseman, but also, as we shall hereinafter indicate, refers to a physical loss or damage. The damages here involved came within neither of the two foregoing categories.

Even if it could be successfully argued that the defendant's tariff is uncertain in its language, such uncertainty must be resolved against the defendant. The defendant was the author of the tariff here in question. If uncertainty exists in the tariff, it is the fault of the party who created the uncertainty. Under such circumstances, the language of the tariff must be construed "most strongly against the party who caused the uncertainty to exist." (Civ. Code, § 1654.) In 93 Corpus Juris Secundum 457, the above rule was spe-

cifically applied to warehouseman's contracts. █ It is there stated:

"Contractual provisions limiting a warehouseman's liability should be construed in the light of governing statutory provisions, and in accordance with the expressed intent of the parties as far as reasonably ascertainable from the language used, and, where actually or presumably drawn by the warehouseman, should be construed strictly against him and in favor of the bailor."

In *Union Const. Co.* v. *Western Union Tel. Co.*, 163 Cal. 298 [125 P. 242], the court laid down the rule, that in construing a contract limiting the liability of a telegraph company for errors in transmission of messages, any uncertainty would be interpreted most strongly against the telegraph company. (P. 315.) See to the same effect *Couture* v. *Ocean Park Bank*, 205 Cal. 338, 344 [270 P. 943, 61 A.L.R. 267].

█ A fair and reasonable construction of the rule 19A(a) indicates that its applicability is limited to physical loss of or physical damage to the goods stored while in the warehouseman's custody. Here, there was no loss of or damage to the goods stored. The damages suffered by the plaintiff resulted entirely from the failure of the defendant to restencil the drums in compliance with the plaintiff's instructions. The obligation safely to keep the goods while in storage was not violated.

The duty to restencil was distinct and separate from the duty of safe storage. The goods were shipped out by the defendant in precisely the same condition in which they were received. No claim is made that the goods were negligently cared for.

There is nothing in the defendant's tariff which limits its liability for a failure to stencil goods in accordance with instructions given by its customers. Had there been such a provision, a different question might have arisen. Holding, as we do, that on the undisputed evidence there was *no loss of* or *damage to* merchandise, we find no basis for limiting the plaintiff's damages. The plaintiff is entitled to the full amount of its damages, to wit, $1,783.80.

█ The sole question remaining to be determined is whether or not the plaintiff is entitled to interest.

On September 16, 1954, the plaintiff made demand on the defendant for the sum of $1,783.80 representing its loss, as found by the court. That loss was ascertained by a process

of simple calculation, namely: multiplying the understated quantity of Dieldrin originally stenciled on the drums, to wit, 991 pounds by $1.80 per pound, representing the market value of the Dieldrin. The damages were, therefore, liquidated, easily ascertained with reasonable certainty, and could be determined by reference to well-established market values. This is a classic case, coming well within the statutory law and decisions, entitling the plaintiff to interest as damages. (Civ. Code, § 3287, and cases hereinafter cited.)

In *Chase* v. *National Indemnity Co.*, 129 Cal.App.2d 853, the court states at page 865 [278 P.2d 68] : "The reason for denying interest on claims is that where the person liable does not know what sum he owes he cannot be in default for not paying. (*Cox* v. *McLaughlin*, 76 Cal. 60, 67 [18 P. 100, 9 Am.St.Rep. 164]. When the exact sum of the indebtedness is known or can be ascertained readily, the reason suggested for the denial of interest does not exist. (*Courteney* v. *Standard Box Co.*, 16 Cal.App. 600, 615 [117 P. 778].)

In *Katz* v. *Enos*, 68 Cal.App.2d 266, the court states at page 278 [156 P.2d 461] : "The more liberal view now prevails that interest will be allowed as damages where the demand, although unliquidated is of such a nature that the amount is capable of ascertainment by mere computation, or can be established with reasonable certainty, *or determined by reference to well-established market values.*" (Emphasis in case cited.)

In *Crabbe* v. *Mires*, 112 Cal.App.2d, 456, the court states at page 461 [246 P.2d 991] : "When damages are capable of ascertainment by calculation or by reference to well-established market values, together with computation, interest is allowable from the time the damages fall due." Citing *Continental Rubber Works* v. *Bernson*, 91 Cal.App. 636 [267 P. 553].)

Although the plaintiff did not in its Amended Complaint make a specific request for the allowance of interest, it did pray for "such other and further relief as to the Court seems proper." Such failure, however, does not defeat the right to interest.

In *Deaux* v. *Trinidad Bean & Elevator Co.*, 8 Cal.App.2d 149, 152 [47 P.2d 535], the defendant had converted beans stored with it by the plaintiff. The beans had been mistakenly delivered to persons not entitled thereto. There was no demand in the complaint for interest. Interest was nevertheless allowed from the date of conversion. The court

states at page 152: "When interest is allowable judgment may be rendered therefor even though not prayed for in the complaint."

In *Perry* v. *Magneson,* 207 Cal. 617 [279 P. 650] (cited with approval in the Deaux case), the court states: "... under the liberal rule prevailing in this jurisdiction, where an answer is filed the court may, after the trial, grant any relief consistent with the case made by the complaint and embraced within the issues. (Code Civ. Proc., § 580.) It may, therefore, render a judgment for interest, though not prayed for. (14 Cal.Jur., p. 691, § 15.)

The two cases relied upon by the defendant are easily distinguishable from the case at bar. In *Perry* v. *Magneson, supra,* cited in the defendant's brief, an action was brought on a contractor's bond following default by him in completing the construction of a residence. It was there held that the damages due the plaintiff could not be ascertained until the court had first taken evidence to determine the reasonable value of the materials and labor necessary to complete the construction work. Until then, the court held, the damages were "uncertain and unliquidated" (p. 623), and the court further stated that, until the judgment was rendered, the defendant "did not know what sum he owes." (P. 623.) No such situation is here presented.

In *Cox* v. *McLaughlin,* 76 Cal. 60 [18 P. 100, 9 Am.St.Rep. 164], the plaintiff sued for services rendered on a *quantum meruit.* The court there stated at page 71:

"But where, as in the case at bar, the amount of the services, their character and value, can only be established by evidence in court, or by an accord between the parties, and are not susceptible of ascertainment, either by computation or by reference to market rates, or other known standard, we are of opinion plaintiff is not entitled to interest prior to verdict or judgment."

The case is remanded to the trial court with instructions to enter judgment in favor of the plaintiff for its damages, to wit, $1,783.80, less the offset to the defendant on its counterclaim of $138.28, leaving a net recovery in the plaintiff's favor and against the defendant for the sum of $1,654.52, with interest thereon at 7 per cent per annum computed from September 16, 1954, to the date of judgment, together with the plaintiff's cost of suit. The plaintiff will recover its costs on appeal.

Conley, P. J., and Popovich, J., concurred.